UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| VISHAKHA SHAH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:06CV00504 AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This action is before the Court[1] for judicial review of the final decision of the Commissioner of Social Security, denying Plaintiff Vishakha Shah's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further consideration.

Plaintiff, who was born on January 23, 1956, applied for disability benefits on October 23, 2002, alleging a disability onset date of May 30, 2001, due to epilepsy, feet problems, and "brain problems." After her application was denied at the initial administrative level, she requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on September 4, 2004, following which the ALJ issued a decision on August 16, 2005, finding that Plaintiff could return to her past relevant work

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

and was therefore, not disabled.  On January 18, 2006, the Appeals Council of the Social Security Administration summarily denied Plaintiff's request for review.  Plaintiff has thus exhausted all administrative remedies and the ALJ's August 16, 2005 decision stands as the final agency action.

Plaintiff argues that the ALJ failed to weigh the medical evidence properly.  Specifically, Plaintiff argues that the ALJ failed to give sufficient weight to the opinion of an examining consulting neuropsychologist; erred in not finding that Plaintiff satisfied the requirements of the listing for mental retardation in the Commissioner's listings of presumed-disabling impairments; assessed a mental residual functional capacity ("RFC") that is not supported by medical evidence; and failed to recognize that Plaintiff's past work was not substantial gainful activity ("SGA"), but rather, was work supported by her family.

## BACKGROUND

**Application Forms**

On the Claimant's Questionnaire, Plaintiff wrote that she had epilepsy "maybe once in three months, and could not remember things, "walk good," or do "anything," like cooking, cleaning, or a "job of any kind."  She wrote that she lived with her brother, sister-in-law, and family, enjoyed watching TV, and went out two or three times a month when her sister-in-law would take her shopping or to temple.  She wrote that she could not go out by herself and always had to have someone with her because she did "not know anything."  She could use the phone to call the three numbers that she knew.

Tr. at 103-06. Plaintiff listed her medications as Phenobarbital, 30 mg, three times a day; Dilantin, 100 mg, three times a day; and Depakote, 500 mg, three times a day; all for epilepsy. Tr. at 103.

Plaintiff reported that she had worked from 1989 to 2001 as a cleaner in her brother's donut shop. She stated that her brother paid her just for going there and working very little, and that she stopped working when her brother's business stopped making enough money to pay her and her health problems got "worse than ever." Tr. at 98, 124. Plaintiff's earnings record shows wages during these years ranging from approximately $9,000 to $25,000. Tr. at 76.

A Daily Activities Questionnaire was completed on November 4, 2002, by a family friend, who reported that Plaintiff was having a hard time with coordination, especially in walking and speech, and could not do any daily work without coaching. The friend stated that Plaintiff was reportedly getting worse and worse, would no longer listen to people, and could not be left alone. Tr. at 102.

**Medical Record**

The record contains medical records from South County Health for the period from July 18, 2002 - March 29, 2004. Results of a July 18, 2002 ECG were considered "Borderline Normal." Tr. at 152. Plaintiff was referred for a head CT, due to complaints of seizures and forgetfulness. Tr. at 151. The CT scan of Plaintiff's head, conducted on July 19, 2002, showed mild bifrontal atrophy bilaterally, and a small area of enhancement in the left internal capsule. Tr. at 159. Progress notes dated July 23, 2002, state that

3

Plaintiff had been seizure-free for four months. Tr. at 146. A pelvic ultrasound conducted on July 30, 2002, showed no remarkable finding. Tr. at 138. An echocardiogram conducted on August 13, 2002, due to a diagnosis of leg edema, was normal. Tr. at 137. And an August 27, 2002 MRI of Plaintiff's brain was interpreted as normal. Tr. at 171.

Progress notes dated October 4, 2002, state that per Plaintiff's mother, Plaintiff had had three seizures in the past 12 months, all in the first six months of this period. Plaintiff's Valproic acid level was low, while her Phenobarbital and Phenytoin were within the reference range. Tr. at 134-35. An EEG performed on October 21, 2002, was normal, both awake and drowsy. Tr. at 142.

On October 28, 2002, Plaintiff's brother accompanied her to a doctor's appointment and reported that she had been seizure-free for over six months. Tr. at 173. Plaintiff's Phenytoin was in the reference range. Tr. at 144. On December 27, 2002, Plaintiff's Phenytoin was again in the reference range. Tr. at 172. The physician who saw Plaintiff ordered that her medications be refilled and suggested that Plaintiff be referred for counseling or job training. Tr. at 166. That same day, Plaintiff saw a social worker, who noted that Plaintiff "appears slow," and that a better evaluation was needed to determine if Plaintiff was depressed or had another condition. Tr. at 167.

According to March 17, 2003 progress notes, Plaintiff's brother reported that Plaintiff had seizures once a month. She was continued on her current medications and instructed to return in four to six months. Tr. at 166. Plaintiff returned for follow up on

4

September 10, 2003, accompanied by her sister-in-law. Plaintiff denied any complaints. Per her sister, Plaintiff had a two to three month occurrence of emesis (vomiting and upset stomach). Plaintiff was instructed to use over-the-counter TUMS, as needed.

**Evidentiary Hearing of September 4, 2004**

Plaintiff, who was represented by counsel and assisted by an interpreter, testified to the following at the hearing. She came to the United States from India in 1981 (at the age of about 25). Since that time, Plaintiff lived with her brother, sister-in-law, brother's daughter, and her brother's mother. She could not remember her address. She had never lived by herself. Plaintiff had worked for her brother in his donut shop, but she could not recall when she stopped or how long she had worked there. She had no health problem other than epilepsy, but the epilepsy caused many seizures and headaches. The last time she had a seizure was the last weekend in August 2004, the week prior to the hearing. She could not remember the time before that. She took medicine daily by herself for her seizure disorder. Tr. at 190-93.

Plaintiff read books in Gujarati. She did not cook or help with housework, though she thought she could figure out how to cook. She washed her own clothes using a washing machine which others would start. She spent her days watching TV and playing cards. She did not go to stores or restaurants and did not know how to drive. Sometimes, she went outside in the back yard, and sometimes would accompany other family members when they went out or to religious services. Tr. at 194.

Plaintiff testified that she stopped working at the donut shop because the company "wasn't doing well," and her brother told her not to work because she "was not doing well" at work, and because she sometimes would fall.  When she watched The Price is Right and Wheel of Fortune on TV, she could not understand the words but could figure out what was happening by the numbers and dollar amounts.  Plaintiff had studied English in India, but after she failed exams at the 12th grade, she stopped.  She completed 11th grade with the assistance of her father, who took her to school and sat with her the entire time.  Plaintiff had tried to take the United States citizenship test once in 1996.  With the assistance of her father, she had studied for the exam for two months, but failed.  Tr. at 194-98.

Mrs. Parul Shah, Plaintiff's sister-in-law, testified that she knew Plaintiff for about 35 years and lived with her for about 22 years.  Plaintiff had epilepsy since she was about seven years old and was not properly educated.  Rather, her parents were overprotective.  As a result, it was difficult to teach Plaintiff now and she could not learn or do anything.  Plaintiff had problems learning new information for, at least, the last 25 years.  Her epilepsy started, at age seven, after a high fever and a seizure.  Because of her mental problem, Plaintiff was passed to the next grade each year even though she got very low scores.  There were no special education classes available to her at that time in India.  Tr. at 198-202.

Mrs. Shah testified that Plaintiff worked in Mrs. Shah's husband's donut shop for a while because they wanted to help Plaintiff "improve her behavior and mental status."

However, Plaintiff did not do much; although she was at work eight hours a day, she worked for maybe two hours and fought with other employees. Plaintiff was supposed to "finish" the donuts and clean the store, but she was never really able to do her job. She could not tell the difference between a cake and yeast donut even after five years of working there. Despite Plaintiff's poor performance, she was paid more than minimum wage as an act of charity by her brother and because the family felt that it would be good for her to get out of the house and have her own money, "but it didn't do any good really." Tr. at 202-04.

Mrs. Shah testified that Plaintiff basically took her medicine every day by herself, though family members would remind her to do so. Lately, Plaintiff had seizures in her sleep, two to three times a month. During a seizure, she would get tense and lose bladder control. The day after a seizure, Plaintiff would complain about headaches, and would sleep until the middle of the day. Plaintiff did not know how to cook, and Mrs. Shah had been unsuccessful in teaching her because Plaintiff did not want to learn. Plaintiff could do her own laundry if someone turned the machine on for her and she vacuumed once in a while, but not well. The family never left Plaintiff alone at home for more than an hour. Mrs. Shah did not think that Plaintiff would know what to do if there were a fire, although Plaintiff was able to make phone calls. Plaintiff did not go anywhere by herself. The family spoke Gujarati at home. They tried to teach Plaintiff to speak English, but never succeeded. They had wanted to put Plaintiff in a "special care program" for adults, but

Plaintiff's father would not allow it when he was alive. Also, Plaintiff could not walk well. Tr. at 204-10.

The ALJ asked a VE whether a hypothetical individual of Plaintiff's age, education, training, and past work experience, who, because of a seizure condition, was precluded from working around dangerous moving machinery, unprotected heights, sharp objects, steam, or pen flames would be able to perform Plaintiff's past relevant work. The VE responded that it depended upon the frequency of the seizures, but that the individual should be able to engage in Plaintiff's work as a cleaner in a fast-food restaurant, or in other settings such as hotels, motels, and office buildings. This work was classified as light and unskilled. Tr. at 210-12.

In response to questioning by Plaintiff's counsel as to whether, in light of Mrs. Shah's testimony, Plaintiff's work at the donut shop really constituted past relevant work, the VE testified that as Plaintiff was paid more than minimum wage for that work, it did not meet the definition of sheltered work, but it might have been supported work in terms of the family situation. The ALJ referenced the evidence that Plaintiff was terminated because the shop did not do well. Mrs. Shah testified again, stating that Plaintiff was paid more than the minimum wage, but that her work was not actually worth minimum wage. Tr. at 212-14.

Plaintiff's counsel noted that there had never been any assessment of Plaintiff's physical or mental RFC by an acceptable medical source. The ALJ explained his position that if there were no record of treatment for a problem, he would not order consultative

8

exams to find out whether a claimant had that problem, because it was the claimant's burden to establish a medically determinable impairment. The ALJ explained that he would order further evaluation or consultative exams when there were conflicts in the evidence, which did not appear in the present case. Plaintiff's counsel pointed out that 20 C.F.R. § 404.1546 imposed the responsibility for assessing a claimant's RFC on the ALJ. Plaintiff's counsel believed that under this regulation, Plaintiff was entitled to consultative examinations for both physical and mental impairments. He noted Mrs. Shah's testimony regarding Plaintiff's "significant cognitive limitation." The ALJ said that he would allow counsel time to submit a brief on the question of whether the ALJ was under an obligation to order the consultative exams. Tr. at 214-17.

Plaintiff was called to testify again. She stated she could stand one to two hours on her feet at one time, and could walk on the treadmill or ride a stationery bicycle for two and a half miles at one time. She could only carry in one hand because her leg had been fractured two or three times. Tr. at 218.

**Post-hearing Evidence**

Following the hearing, Plaintiff's counsel arranged for a consultative neuropsychological evaluation by F. Timothy Leonberger, Ph.D. Dr. Leonberger reviewed the Plaintiff's medical records, and on March 1, 2005, examined Plaintiff and administered the Wechsler Adult Intelligence Scale-III ("WAIS-III"). Mrs. Shah served as Plaintiff's interpreter during the interview. Plaintiff reported that she could not stand, even for two minutes. Mrs. Shah told Dr. Leonberger that the family paid Plaintiff for

9

full-time work from 1988 to 2000. However, Plaintiff only worked one or two hours a day and had great difficulty taking direction from others. This arrangement was out of charity by Plaintiff's brother and gave Plaintiff something to do during the day so that she would be out of the home. Plaintiff had never been seen by any mental health professionals for psychological or emotional problems. Tr. at 179-80

Dr. Leonberger observed that Plaintiff's speech seemed to be slower and less clear than Mrs. Shah's. Plaintiff appeared to be mildly depressed; her affect was flat in general but at times she smiled "in a silly fashion." Her gait and motor movements were slow and she appeared to have awkward fine-motor movements. She responded "quite slowly" to instructions but appeared to understand the tasks that were presented to her, and Dr. Leonberger stated that the current test results were considered to be a valid estimate of her intellectual functioning. He then added that the performance subtests of the WAIS-III were administered, but not the verbal subtests, due to the language and cultural differences, and that even the performance subtests did not have "standardized norms" for the Indian subculture, so that his measures should be considered "as a qualitative nature rather than a quantitative finding." Tr. at 179-81.

These results were a Performance IQ score of 59, a Verbal Comprehension Index of 62, and a Perceptual Organization Index of 63, all indicating an "extremely low range" of functioning.[2] Dr. Leonberger diagnosed Plaintiff with Dementia NOS (not otherwise

---

[2] The WAIS-III classifies IQ scores within the 90-109 range as average; scores within the 80-89 range as low average; scores within the 70-79 range as borderline; and scores of 69 or below as extremely low.

specified); seizure disorder, back pain, and left leg pain, all by history; and a current and high-for-the-year Global Assessment of Functioning ("GAF") score of 40.[3] Dr. Leonberger found marked impairment in Plaintiff's activities of daily living, social functioning, concentration, persistence, and pace. He found that given Plaintiff's intellectual and neuropsychological limitations, she did not appear to be capable of even working in a sheltered workshop, and he found severe impairment in this area. He also opined that Plaintiff was not capable of handling funds in her own best interest. Tr. at 182-84.

**ALJ's Decision**

The ALJ found that Plaintiff had not engaged in SGA since her alleged disability onset date of May 30, 2001. He held that although her impairments might be "severe," in that they had more than a minimal effect on the ability to engage in work-related functions, they did not meet or equal a presumed-disabling impairment listed in the Commissioner's regulations (20 C.F.R. pt. 404, subpt. P, app. 1) ("Appendix 1"). The ALJ summarized the medical evidence and Plaintiff's testimony, and cited Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), for the standard in evaluating a

---

[3] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31 to 40 reflect "major" difficulties in social, occupational, or school functioning; scores 41-50 indicate "serious" difficulties in these areas; scores of 51-60 indicate "moderate" difficulties; and scores of 61-70 indicate "mild" difficulties.

claimant's subjective complaints. He found that Plaintiff's allegations of symptoms precluding all SGA were not credible. He noted that no physician had stated that Plaintiff was disabled or could not work, which he believed detracted from her subjective complaints. The ALJ found that Plaintiff was credible to the extent that she had the following RFC and limitations: able to perform work at the light exertional level; unable to speak or understand English; and unable to work around dangerous moving machinery, at unprotected heights, and around sharp objects, steam, or open flames. Tr. at 10-13.

The ALJ found Dr. Leonberger's evaluation of "limited value" because, according to the ALJ, it was based on information at odds with Plaintiff's testimony. In support of this conclusion, the ALJ noted that Plaintiff reported to Dr. Leonberger that she could not stand for even two minutes, but she testified that she could stand for one to two hours or more, and use a treadmill and exercise bicycle for two and a half hours. With regard to the WAIS-III results, the ALJ pointed to Dr. Leonberger's statement that the results should be considered estimates of a qualitative nature rather than a quantitative finding. The ALJ also stated that Dr. Leonberger's conclusions were not consistent with Plaintiff's earnings at the SGA level from 1989 through 2000, or with the weight of other (unspecified) medical evidence. Tr. at 13.

The ALJ stated that assuming Plaintiff had borderline intellectual functioning, this would not preclude her past relevant work as a cleaner at a donut shop or at other sites identified by the VE. Accordingly, the ALJ found that Plaintiff could return to her past

work as a donut shop cleaner, and was, therefore, not entitled to the Social Security disability benefits. Tr. at 13.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any SGA which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins

by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If so, the claimant is presumed conclusively to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If the claimant has past relevant work and is able to perform it, she is not disabled. If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience. If a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's

regulations, the ALJ must consider testimony of a VE to determine that there are jobs available in significant numbers which the claimant could perform. A VE's identification of such jobs that an individual with the claimant's vocational factors and RFC could perform constitutes substantial evidence that the claimant is not disabled.

**Discounting Consulting Neuropsychologist's Report / Failing to Find that Plaintiff's Mental Impairments Met a Listing / Assessing Plaintiff's Mental RFC**

Plaintiff's arguments are interconnected. She argues that the ALJ erred in discounting Dr. Leonberger's evaluation of Plaintiff's mental status. She asserts that the reasons given for the ALJ for not deferring to Dr. Leonberger's assessment and test results are insufficient. Plaintiff argues that as a result, the ALJ erred in not finding that Plaintiff met the Commissioner's listing for mental retardation, which provides that a claimant with an IQ score of 59 or less is considered to be mentally disabled; as is a claimant with a score between 60 and 70, if she also suffers from a "physical or other mental impairment imposing an additional and significant work-related limitation of function," or meets at least two of the following four criteria: marked restriction of activities of daily living; marked difficulty in maintaining social functioning; marked difficulty in maintaining concentration, persistence or pace; repeated episodes of extended-duration decompensation. 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.05. Plaintiff further argues that the ALJ's assumption that Plaintiff could function at the borderline intellectual level is not based on any medical evidence.

The weight to be given to a medical opinion is governed by a number of factors including the nature and length of the relationship; the consistency and supportability of the source's opinion; and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). Dr. Leonberger's evaluation as an examining consultant who saw Plaintiff only once, does not carry as much weight as would the evaluation of a treating medical source. His mental evaluation, however, is the only medical evidence in the record on the issue of Plaintiff's mental functional abilities. The reasons given by the ALJ for discounting Dr. Leonberger's findings are indeed weak. As noted above, the ALJ stated that Dr. Leonberger's findings were "based on information at odds with Plaintiff's testimony," in that Plaintiff reported to Dr. Leonberger that she could not stand for even two minutes, whereas she testified that she could stand for one to two hours or more. This is clearly not a sufficient basis to discount Dr. Leonberger's findings with regard to Plaintiff's mental abilities.

With regard to the WAIS-III results, the ALJ pointed to Dr. Leonberger's statement that the results should be considered estimates of a qualitative nature rather than a quantitative finding. Again, however, this is not a reason to discount Dr. Leonberger's findings in their entirety. The ALJ also stated that Dr. Leonberger's conclusions were inconsistent with the weight of other medical evidence. As noted above, though, there is no other medical evidence in the record concerning Plaintiff's mental status.

16

Last, the ALJ asserted that Dr. Leonberger's conclusions were not consistent with Plaintiff's earnings at the SGA level from 1989 through 2000. This brings the Court to Plaintiff's remaining argument, namely, that the ALJ erred in considering Plaintiff's work at her brother's donut shop as "past relevant work" done at the SGA level.

Under the Commissioner's regulations, past work experience is relevant "when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a). Substantial gainful activity is defined as work activity which is both substantial and gainful. 20 C.F.R. § 416.972. Substantial activity is significant physical or mental work that is done on a full- or part-time basis; gainful activity is simply work that is done for compensation. § 416.972(a) & (b). To determine if the work is substantial and gainful, factors such as the amount of compensation and whether the work is done in a special or sheltered environment are considered. §§ 416.973, 416.974(a). A claimant is presumed to be engaged in substantial gainful activity if her earnings from that activity exceed the limits set by the regulations. § 416.974(b)(2).[4]

---

[4] Under this regulation, for months before January 2001, a claimant was presumptively engaged in SGA if the claimant's average monthly earnings equaled or surpassed a set amount. In 2000 this amount was $700. Beginning in 2001, a claimant is presumptively engaged in SGA if the claimant's average earnings equal or surpass the larger of (a) the previous year's earnings or (b) an amount calculated using a formula incorporating the national wage index. A description of the formula is available at http://www.ssa.gov/OACT/COLA/SGA.html.

Here, the record is clear that Petitioner's earnings from her work in her brother's donut shop were over the limit determined by the regulations. Under the Commissioner's regulations, however, there are several other factors to consider in determining whether a disability claimant worked at the SGA level, including how well the claimant performed the work, and whether the work was done under special conditions, such as being able to work only because others helped get the claimant to and from work, requiring and receiving special assistance from other employees, and having been given the opportunity to work, despite the claimant's impairment, because of a family relationship or the employer's concern for the claimant's welfare. 20 C.F.R. § 416.973.

The uncontroverted testimony of Plaintiff and her sister-in-law indicates that the only job Plaintiff ever held -- that of cleaner in her brother's donut job -- was not performed at the SGA level. See Thomason v. Apfel, No. 98-4088-MWB, 1999 WL 33657676, at *15 (N.D. Iowa Sept. 15, 1999) (holding that the plaintiff's prior job did not qualify as "past relevant work" where she testified that her employer made the job up for her after she developed her disability so that she would have something to do, and that she provided minimal assistance and was not required to meet output quotas); see also Jozefowicz v. Heckler, 811 F.2d 1352, 1357 (10th Cir. 1987) (fact "that an impaired claimant attempts to work at what could be construed as substantial gainful employment does not demonstrate that a claimant successfully does so and is not disabled").

A disability claimant's RFC reflects what she can still do despite her limitations. 20 C.F.R. § 404.1545(a). The ALJ's determination of an individual's RFC should be

"based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citation omitted). Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. An RFC is based on all relevant evidence, but it "remains a medical question" and "some medical evidence must support the determination of the claimant's [RFC]." Id. at 1022 (citation omitted). The ALJ is, therefore, required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, as noted above, there is no medical evidence to support the ALJ's assumption that Plaintiff could perform at the borderline intellectual level. Thus, the Court concludes that the ALJ's determination at step four of the sequential process, that Plaintiff could perform her former work at the SGA level, is not supported by substantial evidence in the record. The jobs identified by the VE were essentially the same job as Plaintiff's past work, and the hypothetical question presented to the VE did not include any mental limitations at all. Thus, the VE's testimony did not provide substantial evidence to support the ALJ's conclusion at step four that Plaintiff was not disabled.

The Commissioner argues that the ALJ was entitled to discredit the testimony of Plaintiff and her sister-in-law concerning the nature of Plaintiff's job and performance at the donut shop. However, this testimony is fully supported by Dr. Leonberger's

evaluation, just as his evaluation is, in turn, supported by the hearing testimony. Without another mental evaluation with results contrary to those of Dr. Leonberger, there is no basis in the record for finding that Plaintiff is not disabled, and the decision of the ALJ must be reversed.

In light of Dr. Leonberger's statement that the WASI-III results should be considered estimates of a qualitative nature rather than a quantitative finding, the Court does not believe that the record conclusively establishes that Plaintiff meets listing 12.05 for mental retardation. The Court will, therefore, remand the case to the Commissioner to afford her the opportunity to obtain a mental evaluation by a qualified medical source, and if necessary, new testimony by a VE. Any hypothetical question posed to the VE must include Plaintiff's cognitive limitations, as well as her inability to read and communicate in English.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further development of the record and a new decision, in accordance with this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 21st day of February, 2007